**John PLAIR, Plaintiff–Appellant,**

**v.**

**E.J. BRACH & SONS, INCORPORATED
and E.J. Brach Corporation,
Defendants–Appellees.**

No. 95–2214.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1996.

Decided Jan. 23, 1997.

Sharon Finegan Patterson (argued), Chicago, IL, for Plaintiff–Appellant.

Joel J. Africk, Kenneth R. Dolin, Catherine P. Wassberg, Stephen L. Wood, Jenner & Block, Chicago, IL, Gregory J. Malovance (argued), Adam S. Kosh, Winston & Strawn, Chicago, IL, for Defendants–Appellees.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

MANION, Circuit Judge.

After working nineteen years for candy manufacturer E.J. Brach & Sons (Brach), John Plair was terminated for violating several company rules, including falsification of records and leaving his work area without authorization. Plair filed a grievance but the union declined to arbitrate. He then filed a charge with the EEOC alleging that he was terminated because of his race. After receiving a right to sue letter from the EEOC, Plair filed suit in the Northern District of Illinois again claiming race discrimination in violation of Title VII. The district court granted summary judgment for Brach. We affirm.

Plair, employed by Brach at its Kinzie Street plant in Chicago, worked the second shift, 2:30 p.m. to 12:30 a.m., moving candy and putting cherries on a conveyor belt. During the evening of October 26, 1992, Plair and his co-worker, Arco Jefferson, said they saw a bright light shining into the cherry processing area where they worked on the seventh floor. They went to the windows to look at the light. They said they saw two trains crossing on the railroad tracks below and heard the roar of train engines. Jefferson said that when he stuck his head out the window to get a closer look at the trains, a thin gold chain he was wearing fell off his neck to the ground below. Jefferson and Plair looked for the chain from the window but did not see it.

Around 11:45 p.m. that night, before the end of his shift, Plair left his work area. He knew that before leaving early he had to consult his supervisor, Joe Jackson. According to Jackson, when Plair finished his assigned work early, Brach's procedures were for Plair to sit and wait until the shift ended. Plair had seen Jackson five times that evening, the last time at 11:30 p.m. After completing his work, Plair said he twice looked for Jackson to tell him that for personal reasons he was upset and that he wanted to leave early. Plair did not find Jackson, but left work early anyway. According to Plair, he left work early because he was distraught

over his impending divorce. Plair did not notify any other member of Brach's management or medical personnel of his decision.

Plair claims that after he left his work area he met Jefferson in the plant locker room. Jefferson asked Plair to help him search for the gold chain. Plair agreed. Neither had permission to leave the plant and neither punched out his time card. They left through the plant's front entrance using their computerized employee access card in the turnstile near a security guard. They did not inform Brach's security that they were leaving the plant.

Plair and Jefferson drove Jefferson's truck into the dark woods behind the plant. They said that they looked for the lost chain with the aid of cigarette lighters. After a few minutes they gave up and walked back towards the truck, where two Chicago police officers stopped them. Plair told the authorities he was looking for rocks for his gutter. He did not mention Jefferson's lost chain. The officers told them they were on private railroad property, that they could not drive there, and that they should leave. Plair and Jefferson drove a few blocks away, but only temporarily.

After the police left, Plair and Jefferson drove back and stopped at a 7–Up bottling plant located south of the Brach plant. They parked the truck and walked back to the wooded lot. After spending ten minutes in the woods, Plair and Jefferson began walking back to the truck but were stopped by security guards for 7–Up. Plair told them they were looking for a gold chain Jefferson had lost. One of the security guards, an off-duty police officer, searched Plair and Jefferson, searched Jefferson's truck, and then searched the area where he first saw Plair and Jefferson. Out in the field, he found several boxes of Brach candy weighing approximately 100 lbs. taped together with packaging wrap and a wooden board taped to the top. The guards called police and the same officers who had stopped Plair and Jefferson earlier responded. The guard turned the candy over to the officers. The police again questioned Plair and Jefferson and then arrested them. A criminal complaint was filed against them, but the charges were later dropped. The police detained Plair and Jefferson until approximately 11 a.m. on October 27th.

When Plair arrived for work the next day, he learned the company had suspended him pending investigation of the events of the previous evening. John Klepper, the plant's industrial relations manager, met with Plair and Jefferson on October 30th to discuss the night of October 26th. Plair told Klepper he left his work area at 11:45 p.m. without permission, without telling his supervisor, and without punching out. He told Klepper of the lost gold chain and their attempts to retrieve it, as well as the encounters with the police and the security guards. Plair's statement to Klepper was written down, and Plair signed it. At the meeting Plair did not mention the divorce or feeling ill, two reasons he later offered to explain his early departure.

Klepper investigated the events of that evening for Brach. He instructed Brach's security manager to meet with the bottling plant security guards to get their version of the events. Klepper determined that the "checker sheet," a production record, falsely showed that Plair and Jefferson had worked until 12:30 a.m., 45 minutes after Plair had left the plant. Plair's time card showed that he had punched out at 1:48 a.m., two hours after he left the plant. The other second-shift employees' time cards did not show anyone else punching out around that time. The train schedules did not show two trains running simultaneously on the tracks behind the Brach plant between 10 p.m. on October 26th and 1 a.m. on October 27th. Klepper confirmed with Jackson that Plair did not have permission to leave early. Klepper also visually examined the area behind the plant where Plair and Jefferson were found.

There is no dispute that Plair was aware of the specific work rules requiring him to punch out his time card at the end of his shift; that he was not allowed to have another employee punch out his time card; and that he was not allowed to leave his work area or the plant during his shift without management authorization. Klepper reviewed a "final warning" issued to Plair eight years earlier for leaving his work area and leaving the plant without proper manage-

ment approval. Plair testified later that he did not recall the incident and that he did not sign the acknowledgment of the warning. Also, six weeks before the evening of October 26th, Plair was involved in another disciplinary incident. Plair's "beard net" hung around his neck while he was talking to an employee in another department, and Plair ignored a department supervisor's repeated requests that he replace the beard net. (Apparently, Plair did not realize the individual to whom he was speaking was a supervisor.) When the supervisor—who was black—attempted to explain to Plair the reason behind the beard net rule, Plair walked away and said he "did not want to hear any of [the supervisor's] long stories." Plair also refused to provide the supervisor with his name, identification card, department he worked in, or name of his supervisor. For these actions, Plair received a final warning before termination and a one-day suspension for insubordination and violation of sanitation rules.

With all of this information before him, Klepper concluded the following: Plair had left the plant before the end of his shift without his supervisor's approval; he had failed to punch out his time card as required; that someone else had punched Plair's time card two hours after Plair left the plant; that the checker sheet incorrectly recorded that Plair had worked a full shift; that Plair and Jefferson were found behind the Brach plant under suspicious circumstances with no rational basis for their presence; and that they gave conflicting reasons for being behind the plant where boxes of Brach candy were discovered. Given these conclusions, on November 3, 1992, Klepper discharged Plair and Jefferson. The termination letter alluded to "the circumstances surrounding the events of October 27, in which you were involved," and gave two reasons for termination:

Falsification of employment, production or time records, intentionally altering required medical documentation, or submitting false claims for insurance benefits.

Walking off the job and/or leaving the work area or the plant during one's scheduled working time without authorization from management.

Jackson, Plair's supervisor, replaced Plair with another employee, who was white. Plair filed a grievance challenging his termination, which Brach denied. His union, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 738, chose not to take the grievance to arbitration.

Now Plair claims Brach fired him because he is black. He sued Brach under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. Plair admits he left work without permission from his supervisor and that he failed to punch out. But he contends that Brach should be denied summary judgment because he had direct, circumstantial, and statistical evidence supporting his claim of intentional racial discrimination. Although the district court found that Plair had advanced a prima facie case, it concluded that Brach had proffered a legitimate, non-discriminatory reason for Plair's firing, and that Plair had failed to raise an inference of pretext concerning Brach's decision to terminate. Accordingly, the district court granted Brach's summary judgment motion.[1]

On appeal Plair offers two arguments. First, he asserts direct evidence of racial animus precluded the district court's grant of summary judgment to Brach. If this direct evidence does not get him to a jury, Plair claims that indirect evidence considered under the McDonnell Douglas–Burdine burden shifting method of proof reveals genuine issues of material fact ripe for trial.

We consider Plair's appeal under the same, familiar standard applied by the district court. We review the district court's grant of summary judgment de novo, viewing the record and all reasonable inferences drawn therefrom in the light most favorable to the non-movant. Sample v. Aldi, Inc., 61 F.3d 544, 546 (7th Cir.1995). If there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.

1. The district court had federal question jurisdiction over this Title VII action pursuant to 28

U.S.C. § 1331, and this court has jurisdiction pursuant to 28 U.S.C. § 1291.

R.Civ.P. 56(c). "Summary judgment will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir.1994).

Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color." 42 U.S.C. § 2000e–2(a)(1). Two methods exist for Plair to satisfy his burden of proof: by direct evidence that racial discrimination motivated Brach's decision to terminate him, or by the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Plair attempts to use both methods; we consider each in turn.

■ Plair offers no direct evidence of alleged racial animus. In this circuit, "direct evidence" is defined as evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications*, 876 F.2d 563, 569 (7th Cir.1989). Here, direct evidence would be what Brach and its employees said or did in the specific employment decision in question: terminating Plair. Plair does not contend that Klepper ever said he discharged Plair because he is black. Nor is there any claim Klepper ever referred to blacks in racially derogatory terms. Plair admits that no manager or supervisor at Brach said anything to him that was "racially insulting, hostile, or derogatory," during his termination or ever.

Plair's appeal centers on his assertion of indirect evidence of racial discrimination. Applying the *McDonnell Douglas–Burdine* burden-shifting test, Plair first must establish a prima facie case of racial discrimination by a preponderance of the evidence. *Sample*, 61 F.3d at 547. Without a prima facie case, Plair cannot withstand summary judgment. *See Gilty v. Village of Oak Park*, 919 F.2d 1247, 1250 (7th Cir.1990). To do so, he must show (1) he is a member of a protected class, (2) his job performance met Brach's legitimate expectations, (3) he was fired, and (4) that another, similarly situated but not of the protected class, was treated more favorably. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir.1996). Plair has satisfied three of these criteria.

■ On appeal, Brach concedes that Plair established a prima facie case, which includes a showing that Plair's job performance met Brach's legitimate job expectations. In the district court, Brach expressed its doubts about this second prong of the prima facie case but relegated those doubts to a footnote in its memorandum of law. Based on this record (a relatively lengthy career juxtaposed with the events in this case), we cannot determine whether Plair met Brach's legitimate job expectations. In general, however, we note that pretext analysis is necessary only if a plaintiff has already established a prima facie case, including job performance which satisfies the company's legitimate expectations. *See Villa v. City of Chicago*, 924 F.2d 629, 631 (7th Cir.1991) (evidence that plaintiff was not meeting employer's legitimate job expectations required dismissal of Title VII claim). In many cases, the pretext analysis will dovetail with this element of the prima facie case. But the prima facie case is the condition precedent to pretext analysis. And a company need not articulate its non-discriminatory reason (the pretext phase) to support the discharge of an employee who fails its legitimate job expectations (the prima facie case phase). *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 798 (7th Cir.1995) ("[plaintiff's] failure to establish a prima facie case makes it unnecessary for us to discuss [defendant's] reasons for terminating him or the issue of pretext.").

If we assume that Plair met Brach's legitimate job expectations and established a prima facie case, this creates a presumption of discrimination, and the burden of production shifts to Brach, which must produce a legitimate, nondiscriminatory reason for its action. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994). At this stage, the reason need only be facially nondiscriminatory.

■ Brach has articulated legitimate, nondiscriminatory reasons for terminating Plair. The facts supported Klepper's conclusions that Plair had left the plant before the end of his shift without his supervisor's approval; failed to punch out his time card as required; and that someone else punched out Plair's time card after he left work, in violation of plant rules. The checker sheet recorded Plair had worked a full shift when he had not. Plair and Jefferson were found behind the plant and offered conflicting reasons for being behind the plant where 100 lbs of Brach candy was discovered. Given these facts, Klepper had more than enough information before him to conclude Plair violated Brach work rules, as delineated in Plair's termination letter. Klepper made a reasonable business decision to discharge Plair.[2]

Given that Brach has articulated a nondiscriminatory reason for its employment decision, it has satisfied its burden of production, and "the *McDonnell Douglas* framework-with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Plair thus retains his original burden of proof and must establish by a preponderance of the evidence that Brach's proffered reasons are pretextual. *Id.* "Pretext ... means a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). Thus, to survive summary judgment, Plair must advance facts from which a reasonable jury could infer that Brach fired him for discriminatory reasons.

■ Plair's indirect evidence of race discrimination falls into two categories: circumstantial and statistical evidence. Plair offers two pieces of circumstantial evidence: Klepper's written recitation of the bottling plant security guard's description of Plair as "black," and the affidavits of three other black Brach employees who allegedly experienced Klepper's racial bias and selective enforcement of Brach's work rules. Klepper writing down the bottling company security's guards factual description of Plair as "black" is not reasonably indicative of racial bias. We would be in a sorry state if we held, as a matter of law, that describing someone's race is evidence of discriminatory intent when the description is in neutral, non-offensive language. Nor are the affidavits about Klepper's handling of other cases, which merely constitute subjective opinions, and do not refute the legitimate reasons Brach gave for its handling of these employees' claims. These affidavits are too remote to tell us anything about what Klepper did with Plair. A contrary rule would wind up putting every supervisor's entire life on trial, which is neither required nor desirable. Further, the EEOC investigated two of their charges and dismissed them. Klepper did not even investigate the third employee's complaint. "A showing of other instances of discrimination in the company may have evidentiary value, but it is not a substitute for a showing of injury to the plaintiff." *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1004 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). In fact, the circumstantial evidence regarding Klepper's treatment of Plair cuts against Plair. Six weeks before the October 26–27 incident for which Plair was terminated, a black supervisor at Brach recommended that Plair be discharged for insubordination and violation of Brach's sanitation rules (the "beard net" incident). Klepper did *not* discharge Plair for this misconduct, as he could have, but instead suspended Plair for the remainder of the shift and issued him a final warning. If Klepper had racial animus toward Plair, he had a perfect excuse to exercise it then and fire Plair. Klepper did not. Instead, he chose a substantially lesser punishment of a one-day suspension.

**2.** Klepper also was aware of the candy boxes in the same area where the police discovered Plair and Jefferson for the second time that night. Klepper did not cite attempted theft as a cause for termination; he stated only that Plair and Jefferson were found behind the plant "under suspicious circumstances." We can speculate that attempted theft of the candy was an underlying cause, but not used against Plair because it would have involved criminal charges that would have complicated Plair's discharge. Just so, apparently discharge for theft places a greater burden upon Brach under the collective bargaining agreement, which governed the employment arrangement between Brach and Plair.

▓ Plair also points to statistical evidence purportedly proving racial prejudice. We have held statistics are improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases. *Gilty*, 919 F.2d at 1253 n. 8. Indeed, "[s]tanding virtually alone, as they are in this case, statistics cannot establish a case of individual disparate treatment." *Id.* Even if we were to consider Plair's statistical evidence, we would find that it fails to demonstrate that racial prejudice was at work in this case. Plair's expert, Xiaochang Jin, compared the termination rates for black and white employees with the racial composition of Brach's workforce. This is an insufficient analysis to provide support for Plair's claim of pretext. *See King v. General Elec., Co.*, 960 F.2d 617, 627 (7th Cir.1992) (straight percentage comparisons not statistically significant). He compared terminations of bargaining unit employees with an employment population including bargaining unit and salaried employees. But salaried and temporary employees are not subject to Brach's work rules, including its termination policies, which covered Plair. Importantly, Klepper did *not* terminate salaried employees. Further, in 1992, temporary employees made up nearly 85% of the terminations at Brach. This would follow since they fill a seasonal need and then are terminated. In excess of 80% of Brach's seasonal employees that year were black. This would skew the comparison of terminations of black and white employees. Jin's statistical evidence does not establish that a rational trier of fact could reasonably conclude that Brach discharged Plair because he was black.

▓ Finally, Plair has not offered evidence that Brach lied about why it terminated him. This court looks to determine if a factual dispute exists as to whether the employer's reasons for its decision are honest and genuinely motivated. *See Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir.1995). Plair has admitted that his conduct on October 26–27, 1992 violated the plant's work rules. The facts provided Brach—specifically Klepper—a sufficient basis upon which to terminate Plair. Brach's reasons for discharging Plair do not admit of pretext for racial discrimination. In order to prove pretext, Plair's burden is to squarely rebut the articulated reason for his discharge. *See Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir.1989) ("The plaintiff must focus on the specific reasons advanced by the defendant to support the discharge.") (citing *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1414 (7th Cir.1984)). For example, an employee discharged for poor attendance does not prove pretext by arguing that no other employee did the job better. He only proves pretext by establishing that his attendance was good enough to keep his job. Rather than offer evidence to rebut the reasons Brach gave in the November 3, 1992 termination letter, Plair has admitted the facts which underlie those conclusions.[3] Plair has not presented evidence that calls into question the truthfulness of Brach's reasons for termination.[4] If a white employee had acted

---

3. Plair argues that it is not enough for Brach to show that it had a genuinely held belief that Plair was guilty of misconduct if it disciplined similarly-situated employees of a different race differently for the same conduct. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976). Plair points to the more than 100 examples he gave to the district court of what he says are non-black employees at the Chicago plant who committed the same or more serious offenses but who were not terminated. But because he was not their supervisor, Klepper did not discipline most of these allegedly comparable employees. *See Timms v. Frank*, 953 F.2d 281, 287 (7th Cir.), *cert. denied sub nom. Timms v. Coughlin*, 504 U.S. 957, 112 S.Ct. 2307, 119 L.Ed.2d 228 (1992) (where different decision maker involved, employees are rarely similarly situated). Moreover, most of the "comparables" did not engage in all of the same misconduct Plair did: leave work early without supervisor approval, fail to punch out, his time card was fraudulently stamped; the checker sheet falsely showed him to have completed his shift; and found behind the plant under suspicious circumstances without a coherent explanation. The district court found Plair's circumstances "unique" and thus that Plair's "comparables" did not raise a genuine issue of material fact. We agree with its analysis and that Plair's evidence does not demonstrate that Brach arbitrarily enforced its rules.

4. In fact, other evidence cuts against Plair's claim. Jackson, Plair's supervisor, who replaced Plair with a white male, is black. Further, in Plair's grievance challenging his termination he

as Plair did the night of October 26, 1992, we find no basis for inferring that he would have kept his job.

Conversely, Klepper reasonably believed that Plair fabricated the story about the gold chain. Jewelry is prohibited in the plant; to wear such a chain would violate factory rules. If the chain had been lost, on their way out of the plant why didn't Plair and Jefferson notify the security guard and ask for help finding it, say with flashlights or headlights from a car or truck, rather than by using cigarette lighters? Brach could reasonably conclude that Plair lied about his reason for going down to the railroad tracks: no such trains passed behind the plant between 10 p.m. and 1 a.m. that night. Plair also claimed he was not feeling well because of his divorce, and that is why he left work early, but then he spent time with Jefferson behind the plant allegedly looking for the chain. Plair and Jefferson also lied in their first encounter with the police, and 100 lbs. of candy was found in the location of the woods they were walking. Further, the checker sheet falsely showed they worked a full shift, and their time cards were punched out, by somebody else, when nobody else's were.

Plair has failed to present evidence upon which a reasonable factfinder could infer that racial discrimination was the true reason for his discharge and that Brach lied about the reasons for terminating him. The district court's grant of summary judgment is

AFFIRMED.

did not claim race was a factor in Brach's decision.